# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **JOHN DONOHUE,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:13cv00397 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **Lt. J.D. LAMBERT, et al.,** | ) | |
| Defendants. | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

The pro se plaintiff, John Donohue, an inmate incarcerated at Red Onion State Prison, ("Red Onion"), brings this civil rights action pursuant to 42 U.S.C. § 1983, against the defendants,[1] various Virginia Department of Corrections, ("VDOC"), employees, assigned to Red Onion. In his Complaint and amendments thereto, Donohue alleges that the defendants violated his Eighth Amendment rights through the use of excessive force, as well as their failure to protect and failure to intervene, during incidents which occurred on June 6 and June 7, 2013. (Docket Item No. 1, ("Complaint."))[2] Defendant McCowan has filed a Second Motion For Summary Judgment, (Docket Item No. 343), ("McCowan's Motion"), Defendant Payne has filed a Motion For Summary Judgment, (Docket Item No. 345), ("Payne's Motion"), and a Motion For Summary Judgment And Memorandum In Support Of Motion For Summary Judgment has been filed on behalf of defendants

---

[1] This Report and Recommendation relates to the following defendants: Lt. Daniel McCowan; Lt. P.V. Payne; Sgt. D. Barton; Lt. James Blevins; Corrections Officer K. Brinkley; Corrections Officer T. Carroll; Sgt. C. Deel; Lt. Steven B. Franklin; Maj. Arvil Gallihar; Lt. C.C. Gilbert; Lt. J.D. Lambert; Corrections Officer Thomas McCurdy; Corrections Officer Phillip Mullins; and Corrections Officer S.T. White.

[2] The remaining claims relate to incidents occurring on June 6 and June 7, 2013. Although Donohue initially made claims based on incidents occurring on May 11 and May 20, 2013, these claims were dismissed by Order dated September 25, 2014. (Docket Item No. 89.)

Case 7:13-cv-00397-GEC-PMS   Document 383   Filed 12/10/15   Page 1 of 34   Pageid#: 2417

Gallihar, Brinkley, Carroll, Barton, Lambert, Gilbert, Mullins, Deel, White, Franklin, McCurdy and Blevins. (Docket Item No. 347), ("Defendants' Motion"), (collectively "Motions"). Donohue has responded to Payne's Motion and the Defendants' Motion, and some of the defendants have replied. None of the parties has requested a hearing on the Motions, which are before the undersigned upon referral pursuant to 28 U.S.C. § 636(b)(1). For the reasons discussed herein, the Motions will be granted in part, and denied in part.

*I. Facts*

The undisputed facts are as follows. On June 6, 2013, Donohue was housed in the C Building at Red Onion in cell C-302, and inmate Corey Smith was housed next to Donohue in cell C-303. During recreation on June 6, 2013, Smith passed Donohue a copy of a settlement order in an unrelated prisoner civil rights case. Corrections Officer Rose confiscated the document from Donohue as contraband when he came to the recreation area to return him to his cell. To protest this confiscation, Donohue covered his cell door window and flooded his cell, in violation of institutional rules. Sergeant Deel notified Lt. Payne of this situation. Both Sgt. Deel and Lt. Payne ordered Donohue to uncover his window, and when he repeatedly failed to comply, he was sprayed three times with OC pepper spray after Sgt. Deel received approval to do so from the Medical Department. Major Arvil Gallihar, the Administrative Duty Officer, and also the head of security, was notified of the situation. Major Gallihar approved the use of a cell entry team to remove Donohue from his cell if he failed to become compliant. Donohue continued to be noncompliant with direct orders to uncover his cell door window and back up to the cell door to be restrained. At some point, Donohue made a statement to the effect of "You are going to have to kill me before I come out." After repeated refusals to comply, Lt. Payne, in accordance with Major Gallihar's

-2-

authorization, utilized a cell entry team to restrain and remove Donohue from his cell. This cell entry team was comprised of five individuals: (1) Corrections Officer White; (2) Corrections Officer Carroll; (3) Corrections Officer Rose; (4) Corrections Officer McCurdy; and (5) Corrections Officer Mullins. Within less than one minute of the team's entry into Donohue's cell, he was restrained and removed.

Although there is some dispute regarding the restraint and removal of Donohue from his cell, it is undisputed that at least one officer carried an electronic shield. It also is not disputed that, upon entry, Donohue was wearing only boxer shorts and flip flops, and he was holding his mattress in front of him. Upon their entry, the officers advanced toward Donohue, who slipped on the wet floor and was pushed backwards onto his back and onto his bed. Restraints were applied, and Donohue was removed from the cell.

Once removed from the cell, Donohue was escorted by Officers White and Carroll to the shower for decontamination of the OC spray. He remained in the shower for slightly more than one minute. A spit mask was placed over Donohue's head. Once removed from the shower, Donohue was escorted, via wheelchair, to the Medical Department by Officers White and McCurdy. Upon arrival at Medical, Nurses Cox, Deel and Yates assessed him for any injuries resulting from the cell extraction and utilization of OC pepper spray. After the medical examination was complete, Donohue was taken to Medical Cell #1, where he was placed in five-point restraints by Lt. Blevins, Lt. Lambert and Sgt. Barton in accordance with Major Gallihar's approval. Nurse Stanley checked the placement of the restraints, concluding that it was proper, as she could fit two fingers underneath each wrist and ankle strap, and she could fit her palm underneath the chest strap. Donohue voiced no complaints to Nurse Stanley at that time.

-3-

Donohue remained in five-point restraints from approximately 5:15 p.m. on June 6, 2013, until 8:10 a.m. on June 7, 2013. He was allowed to be placed in ambulatory restraints for restroom breaks and to eat breakfast over this time period.

These are the undisputed facts in this case. The facts that follow, however, are disputed by the parties.

Donohue alleges that, during the cell entry, Officers White and Carroll each struck him in the head twice while he was restrained on his bed. He further claims that these same officers physically assaulted him while he was being decontaminated in the shower, by kneeing him in the ribs and slamming his head into the shower wall and that Officer White pushed his head underneath the water to wash the blood from his injuries off of his face. The officers claim that a spit mask was placed over Donohue's head because he attempted to spit on them, while Donohue claims it was used to cover injuries to his head resulting from a physical assault in the shower. Both Officer White and Officer Carroll flatly deny these allegations, stating that they did not physically assault him either in his cell or in the shower. The handheld video recording of Donohue's decontamination in the shower does not show any officer assaulting him. The court notes, however, that the camera is not continually pointed in Donohue's direction in the shower and, when it is pointed to the shower, Donohue cannot be seen, as various officers are blocking the camera's view of him.

Further disputed facts revolve around whether Donohue continued to display disruptive or aggressive behavior or make threats toward staff while he was in five-point restraints. The defendants have produced documentary evidence supporting such a contention, but Donohue claims that, following his removal from his cell, he displayed no such behavior and made no such threats to staff to justify either

-4-

placing or keeping him in five-point restraints for approximately 15 hours. First, the defendants have provided an affidavit from Lt. Paul Payne, in which he states that Donohue was placed in five-point restraints in order to control his disruptive behavior. (Docket Item No. 56, ("Payne Affidavit"), at 3.) Also, Officer White's answers to interrogatories propounded by Donohue have been provided to the court, in which White states that Donohue was attempting to spit at staff and was verbally threatening staff while in the shower. (Docket Item No. 368-3, ("White Interrogatories"), at 6.) White further stated that Donohue made the statement "You will have to fucking kill me" before the officers entered the cell, so, according to White, Donohue was a danger to himself and staff both before and after the cell extraction due to verbal threats and combativeness. (White Interrogatories at 6-7.) Likewise, in answers to interrogatories, Officer Carroll stated that Donohue was verbally disruptive to Red Onion staff. (Docket Item No. 348-6, ("Carroll Interrogatories"), at 3.)

The defendants also have supplied notes from the Medical Department's Log Book while Donohue was kept there in five-point restraints. (Docket Item No. 348-8, ("Log Book")). At 5:52 p.m. on June 6, 2013, Officer Bloodgood noted that Donohue was being disruptive and yelling out "I'm going to kill all you officers." (Log Book at 1.) At 6:07 p.m., Officer Bloodgood noted that Donohue continued to be disruptive, yelling "I'm going to kill all you [corrections officers]." (Log Book at 1.) Officer Bloodgood noted that, at 6:36 p.m., Donohue was being disruptive and yelling "When I get out of these restraints I'm going to shit you down." (Log Book at 1.) At 7:31 p.m., it was noted that Donohue was threatening to hurt staff when he was released from restraints. (Log Book at 1.) At 7:41 p.m., Donohue was aggressive toward staff and would not respond to an offer for a

restroom break.  (Log Book at 1.)[3]  At 8:28 p.m., Donohue continued to be described as disruptive, stating "All you [corrections officers] are going to get it." (Log Book at 2.)  Again, at 9:40 p.m., Officer Bloodgood indicated that Donohue was being disruptive, stating that he was going to hurt any staff and corrections officers that he could.  (Log Book at 2.)  At 11:03 p.m., Officer Bloodgood noted that Donohue stated that when he was released from restraints, "You officers are going to pay."  (Log Book at 2.)

At 12:54 a.m. on June 7, 2013, when Lt. McCowan and Sgt. Axtell offered Donohue a restroom break, he was disruptive, but after being asked three times, he decided he needed a break.  (Log Book at 2.)  Donohue was let up and placed in ambulatory restraints without incident, but continued to show anger toward staff. (Log Book at 2.)  Following this break, Donohue was returned to five-point restraints without incident.  (Log Book at 2.)  At 1:10 a.m., Officer Bloodgood indicated that Donohue was being disruptive, showing a lot of anger toward staff and threatening to hurt staff.  (Log Book at 2.)  At 2:22 a.m., Officer Bloodgood again indicated that Donohue was being disruptive, stating "I'm going to get you [corrections officers] when they let me up out of restraints."  (Log Book at 3.)  At 3:17 a.m., Officer Bloodgood noted that Donohue continued to be disruptive, stating "I'm angry at all [corrections officers] and I will get them."  (Log Book at 3.)  At 3:44 a.m., Lt. McCowan, Sgt. Mullins, Corrections Officer Muncy and Corrections Officer Adams entered to let Donohue up for a restroom break.  (Log Book at 3.)  He continued to be aggressive toward staff.  (Log Book at 3.)  After the restroom break, Donohue was returned to five-point restraints without incident. (Log Book at 3.)  Nurse Stanley checked Donohue's vital signs and the restraints at that time, and she noted no injuries to staff.  (Log Book at 3.)  At 3:59 a.m., Officer

---

[3] This entry was clarified by the defendants in Docket Item No. 370.  In the original entry offered to the court at Docket Item No. 348-8, part of the note was cut off and / or was illegible.

Bloodgood indicated that Donohue was still being aggressive toward staff and was "very angry." (Log Book at 3.) Again, at 5:22 a.m., it was noted that Donohue was being disruptive and very aggressive and angry toward staff. (Log Book at 3.) At 6:50 a.m., Lt. Day and Lt. L. Fleming placed Donohue into ambulatory restraints to eat breakfast and to use the restroom. (Log Book at 4.) At 8:10 a.m., Lt. Day noted that Donohue was released from five-point restraints. (Log Book at 4.) At 8:23 a.m., Donohue was returned to his cell, C-302, per Lt. Day. (Log Book at 4.)

In further support of the defendants' contention that Donohue continued to display disruptive and/or aggressive behavior while in five-point restraints, they have submitted a Special Watch Log, which indicates 15-minute checks were made on Donohue beginning at 5:30 p.m. on June 6, 2013, and ending at 8:13 a.m. on June 7, 2013. (Docket Item No. 348-9, ("Special Watch Log")). At 7:40 p.m. on June 6, 2013, it was noted that Donohue was disruptive. (Special Watch Log.) At 12:52 a.m. on June 7, 2013, it also was noted that he was aggressive toward staff. (Special Watch Log.) At 3:42 a.m. it was indicated that Donohue was aggressive and disruptive. (Special Watch Log.) There are 12 notations to "DI" on this log; however, there is no explanation as to what "DI" means. (Special Watch Log.) The times corresponding to these "DI" notations are as follows: 5:52 p.m.; 6:07 p.m.; 6:36 p.m.; 7:31 p.m.; and 8:28 p.m. on June 6, 2013; and 1:25 a.m.; 2:22 a.m.; 3:17 a.m.; 3:59 a.m.; and 5:22 a.m. on June 7, 2013.[4] At 8:10 a.m. on June 7, 2013, it is indicated that Donohue was released. (Special Watch Log.) This Special Watch Log indicates that Donohue received three bathroom breaks. (Special Watch Log.)

---

[4] There are two additional "DI" notations on the Special Watch Log; however, the times are partially cut off. They do appear to have been at some time on June 6, 2013. (Special Watch Log.)

-7-

Donohue contends that he sustained a permanent injury to his left wrist when Officer White placed handcuffs on him too tightly during the cell extraction. He further alleges that he sustained injuries to his face and forehead and two swollen eyes. The defendants dispute such contentions and have provided Donohue's medical records from Red Onion, along with an affidavit from Vicky Phipps, Director of Nursing at Red Onion. Donohue's medical records reflect that, when he was brought to the Medical Department for assessment at approximately 4:50 p.m. on June 6, 2013, several lacerations and scrapes were noted, as well as red areas to his face, chest, arms and back. (Docket Item No. 348-4, ("Phipps Affidavit"), at 2.) Swelling to the right eye also was noted. (Phipps Affidavit at 2.) The areas were cleaned with sterile water, and Donohue was advised to follow up with Medical as needed. (Phipps Affidavit at 2.) His medical records also indicate that, at approximately 5:15 p.m. on June 6, 2013, a nurse checked Donohue in five-point restraints. (Phipps Affidavit at 2.) She could place two fingers beneath each wrist and ankle restraint, and she could place the palm of her hand under the chest restraint. (Phipps Affidavit at 2.) Donohue voiced no complaints at that time, and he was instructed to notify Medical if needed. (Phipps Affidavit at 2.) On June 7, 2013, Medical checked Donohue in the five-point restraints at 1:22 a.m., 3:45 a.m., 3:55 a.m. and 5:30 a.m. (Phipps Affidavit at 2.) At 7:00 a.m., on June 7, 2013, Donohue complained of a headache when checked by the nurse. (Phipps Affidavit at 3.) His medical record reflects that he walked with a steady gait to the door, indicating that he was not confined to five-point restraints at that time. (Phipps Affidavit at 3.) Donohue was given Tylenol. (Phipps Affidavit at 3.) On June 7, 2013, at 8:15 a.m., Donohue was checked by the nurse, and he stated that his left hand hurt. (Phipps Affidavit at 3.) The nurse noted that he had been released from five-point restraints and was alert and oriented. (Phipps Affidavit at 3.) No redness, bruising or deformities were noted,

and Donohue was referred to the doctor for a June 11, 2013, appointment. (Phipps Affidavit at 3.)

On June 10, 2013, Donohue saw the doctor for left hand pain and loss of sensation after being handcuffed too tightly on June 6, 2013. (Phipps Affidavit at 3.) The doctor observed several healing scrapes on the scalp, but there was no abnormal redness or swelling. (Phipps Affidavit at 3.) The doctor noted that Donohue's left hand had good strength and normal appearance with numb areas, and he diagnosed neuropraxia / acute nerve trauma that likely would resolve with time. (Phipps Affidavit at 3.) Donohue was subsequently seen for left wrist pain on June 11 and June 12, 2013, for which he received Motrin. (Phipps Affidavit at 3.) On July 16, 2013, Donohue again saw the doctor, who gave him Elavil for neuropraxia of the left hand. (Phipps Affidavit at 3.) However, on July 21, 2013, Donohue refused the 50 mg of Elavil, stating that it was "too strong." (Phipps Affidavit at 3.) On July 23, 2013, the doctor reduced the Elavil dosage to 25 mg for 30 days. (Phipps Affidavit at 3.) When Donohue saw the nurse on July 24, 2013, for complaints of left wrist pain, she referred him to the doctor. (Phipps Affidavit at 3.) On July 30, 2013, he informed the doctor that he had stopped taking the reduced dosage of Elavil because it caused headaches. (Phipps Affidavit at 3.) The doctor ordered a new medication for Donohue's hand numbness. (Phipps Affidavit at 3.) However, on September 3, 2013, Donohue informed the doctor that this medication was not helping his left hand pain. (Phipps Affidavit at 4.) The doctor prescribed Mobic for nerve pain. (Phipps Affidavit at 4.) Donohue has made no additional complaints regarding his hand. (Phipps Affidavit at 5.) Phipps testified in her affidavit that, based on her review of the record, Donohue received adequate medical assessment and treatment following the June 6, 2013, incident. (Phipps Affidavit at 5.)

## II. Analysis

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, *Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

In his Complaint, and amendments thereto, Donohue alleges that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. He alleges the unconstitutional use of excessive force by Officers White and Carroll, as well as Lt. McCowan, Major Gallihar, Lt. Lambert, Sgt. Barton and Lt. Blevins. Donohue seeks to hold several of the defendants liable for failing to intervene under a theory of bystander liability, including Lt. Payne, Lt.

Lambert, Officer Brinkley, Lt. Gilbert, Officer Mullins, Sgt. Deel, Lt. Franklin and Officer McCurdy.[5]

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

"Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761. Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component. *See Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). Specifically, he must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm" rather than in a good faith effort to maintain or restore discipline. *Whitley*, 475 U.S. at 320 (internal quotation marks omitted). To satisfy the subjective component, a

---

[5] As a pro se inmate, the court has construed Donohue's claims against the defendants liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that allegations of pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers).

Case 7:13-cv-00397-GEC-PMS   Document 383   Filed 12/10/15   Page 11 of 34   Pageid#: 2427

claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In an excessive force claim, that state of mind is "wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322. In determining whether a prison official has acted with "wantonness," courts may consider the following factors:

1)    The need for application of force;

2)    The relationship between that need and the amount of force used;

3)    The threat "reasonably perceived by the responsible officials;" and

4)    "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. While the court must afford deference to prison administrators' "discretion" regarding necessary measures to maintain security, that discretion "does not insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley*, 475 U.S. at 322. If "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain," and it presents a factual issue as to whether the force was nontrivial, the case must go to trial. *Whitley*, 475 U.S. at 322.

The objective component of an excessive force claim is not as demanding, however, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,] whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. Instead, an inmate must

show that the force used was "nontrivial." *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010). "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). In fact, the extent of the injury may suggest "'whether the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38.

### A. *Excessive Force*
#### 1. *Cell Extraction*

Based on the evidence presented, I find that there are genuine disputes of material fact regarding whether Officers White and Carroll used excessive force during the June 6, 2013, cell extraction of Donohue. Donohue alleges that Officers White and Carroll each punched him twice in the head while he was restrained, resulting in injury. Officers White and Carroll both flatly deny this allegation. While there is handheld video footage of the cell extraction, which the court has reviewed, the actual restraint of Donohue is not visible, as the view of the bed, where Donohue was restrained, is blocked by the other officers on the cell entry team. It does appear that there was some sort of struggle between the officers and Donohue, and one of the officers can be heard telling Donohue to stop resisting. However, the video does not capture what is actually happening to Donohue at this time. The video also is not steady, as it is clear that the officer responsible for

recording the cell extraction, Officer Brinkley, was moving around during the recording. Thus, for various reasons, the video does not aid in resolving the issue of whether Officers White and Carroll punched Donohue in the head during the cell extraction. The defendants also have provided sworn testimony by Lt. Payne, stating that he did not see Officer White or any other officer strike Donohue after he was restrained in his cell or during the cell extraction. (Payne Affidavit at 3.) On the other hand, Donohue's allegations are supported by his medical records, which reflect that he had several lacerations and scrapes, red areas to his face and a swollen right eye, among other things.

Viewing Donohue's version of the facts as true, as the court must at this stage, I find that Officers White and Carroll punching him in the head four times while he was restrained constitutes more than a mere push or shove that caused no discernible injury. For these reasons, I find that Donohue has sufficiently established genuine disputes of material fact as to whether he was subjected to a nontrivial amount of force meeting the objective component of an excessive force claim as to Officers White and Carroll regarding the alleged June 6, 2013, assault in his cell for summary judgment purposes.

Next, I find that there also are genuine disputes of material fact regarding whether these defendants applied this force maliciously and sadistically for the very purpose of causing harm or in a good faith effort to maintain or restore discipline. In particular, the defendants contend, and Donohue does not dispute, that prior to conducting the cell entry, Donohue had covered his cell window, he had flooded his cell, and he had refused numerous direct orders from multiple prison officials to uncover his window and back up to the tray slot to be restrained and removed, all in violation of institutional rules. Despite being sprayed with OC pepper spray three times, he continued to disobey these direct orders. Donohue

further concedes that he made a statement to the effect of "You are going to have to kill me before I come out." Donohue admitted that he had no intention of willingly exiting his cell and that the officers had no reason to believe that he would come out peaceably. Given these circumstances, I find that there was a need for the application of force. Donohue's own defiant and noncompliant actions, coupled with his potentially threatening statement, created a security threat which necessitated a use of force to restore order and to ensure the safety of inmates and staff.

Next, I find that the relationship between the need for force and the amount of force used cuts in favor of Donohue. While the defendants needed to restrain Donohue to remove him from his cell, Donohue claims that he already was restrained when he was struck in the head. Viewing the facts in the light most favorable to Donohue, a jury could find that such force was simply unnecessary. Next, I find that Donohue's admitted behavior leading up to and culminating in the cell extraction, constituted a threat reasonably perceived by the responsible officials. He had violated multiple institutional rules and made a potentially threatening statement to the officers, announcing his unwillingness to exit his cell alive. Finally, I find that no evidence has been produced that Officers White and Carroll made any efforts to temper the severity of the alleged forceful response.

Officer White has provided sworn testimony that when Donohue's cell door opened, Donohue attempted to strike him and Officer McCurdy. (Docket Item No. 348-3, ("White Affidavit"), at 2.) However, team members were able to place Donohue on the bed to gain control of him, where the restraints were applied. (White Affidavit at 2.) White said he did not attempt to harm Donohue during the extraction, nor did he strike Donohue after he was restrained in his cell. (White Affidavit at 2.) He stated that he used the proper amount of force necessary to

restrain Donohue so he could not harm himself or staff. (White Interrogatories at 4-5.) Donohue contends that Officers White and Carroll punched him in the head multiple times while he was restrained. Thus the parties' contentions stand in direct contradiction on this issue.

For all of the above-stated reasons, I find that genuine disputes of material fact exist as to whether these defendants applied force in a good faith effort to maintain or restore discipline or maliciously and sadistically to cause harm. That being the case, I recommend that the court deny the Defendants' Motion as to Donohue's excessive force claims against Officers White and Carroll related to the physical assault in his cell on June 6, 2013.

The defendants further argue that they are entitled to the defense of qualified immunity on this claim. "Qualified immunity is an affirmative defense that shields public officers performing discretionary duties from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lovelace v. Lee*, 472 F.3d 174, 196 (4th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). When a government official properly asserts the defense of qualified immunity, he is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223 (2009).[6] For

---

[6] *Pearson* overruled that part of the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), which mandated that courts conduct the two-step qualified immunity

the reasons stated above, I find that Donohue has established genuine disputes in fact regarding whether Officers White and Carroll used excessive force on him during the cell extraction on June 6, 2013. That being the case, I find that granting qualified immunity in their favor at this time is not appropriate.

## 2. Handcuffs

Donohue also claims that Officer White used excessive force against him in placing the handcuffs too tightly to his left wrist during the June 6, 2013, cell extraction. He alleges that he has permanent nerve damage to his left wrist, for which he has sought medical treatment. Officer White has provided sworn testimony that he did not apply the handcuffs, but the leg irons, to Donohue during the June 6, 2013, cell extraction. (White Affidavit at 2.) However, in an Internal Incident Report, as well as in answers to interrogatories, Officer Carroll stated that it was he who had the primary responsibility to apply the leg irons to Donohue during the extraction. (Docket Item No. 348-5, ("Carroll Incident Report"), at 1); (Carroll Interrogatories at 2.) In deposition testimony from August 31, 2015, Donohue stated that it was Officer White who placed the cuff on his left wrist because White was on Donohue's left side in the cell. (Docket Item No. 348-15, ("Donohue August Deposition"), at 2.) He further stated that Officer White was the one responsible for hurting his left wrist with the handcuff. (Docket Item No. 348-14, ("Donohue May Deposition"), at 29.) The VDOC Incident Report of the June 6, 2013, cell extraction does not specify which officer placed handcuffs on Donohue. (Docket Item No. 348-13, ("VDOC Incident Report")). Likewise, the video of the cell extraction does not resolve this dispute.

_____

inquiry in sequential order. *See* 555 U.S. at 234-36. Courts now "have the discretion to decide whether that procedure is 'worthwhile'" and "determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242. Otherwise, *Saucier* remains as binding precedent.

I find that Donohue has presented sufficient evidence to establish that the amount of force used in applying the handcuffs to his left wrist was nontrivial. In particular, Donohue's medical records reflect that, when he was checked by a nurse at 8:15 a.m. on June 7, 2013, he complained of left hand pain. The nurse noted no redness, bruising or deformities, but referred him to see the doctor on June 11, 2013. One June 10, 2013, Donohue saw a doctor for his complaint of left hand pain and loss of sensation after being handcuffed too tightly on June 6, 2013. The doctor diagnosed neuropraxia / acute nerve trauma that likely would resolve with time. Donohue again was seen for complaints of left wrist pain on June 11 and June 12, 2013, and he received Motrin on both occasions. On July 16, 2013, the doctor prescribed Elavil for neuropraxia of the left hand, but on July 21, 2013, Donohue refused 50 mg of Elavil, stating that it was "too strong." On July 23, 2013, the doctor decreased the Elavil dosage to 25 mg for 30 days. On July 24, 2013, Donohue continued to complain to the nurse of left hand pain, and when he saw the doctor on July 30, 2013, he admitted he had stopped taking the Elavil because it caused headaches. The doctor ordered a new medication for Donohue's hand numbness. On September 3, 2013, Donohue stated this medication was not helping his hand pain, so the doctor prescribed Mobic for nerve pain.

The defendants focus their argument on the fact that Donohue does not have proof of a permanent left wrist injury. I find that such evidence is not necessary, however, when determining whether the objective component of an excessive force claim is met. In *Williams*, the Fourth Circuit specifically held that no enduring injury is necessary, and the objective component can be met by the pain itself. *See* 77 F.3d at 762. As stated herein, it is the nature of the force that matters. I find that a reasonable jury could find that the evidence that Donohue began complaining of pain to medical staff within hours after the application of the

-18-

handcuffs, coupled with his medical records showing that he saw nurses and doctors with continued complaints of left hand and wrist pain and numbness over a period of approximately three months, for which he received a diagnosis of neuropraxia and for which he was treated with multiple medications, sufficiently establishes a genuine dispute as to whether the nature of the force applied was nontrivial.

I further find that genuine disputes of material fact exist with regard to the subjective component of this claim. I find that there was a need for the force applied, here, the use of handcuffs. Undoubtedly, handcuffs must be utilized in restraining inmates when removing them from their cells, especially in a situation like the one presented here, where the inmate has displayed disruptive and aggressive behavior. However, I find that the relationship between the need for the force and the amount of the force used is questionable based on the evidence the court has before it at this time. While Donohue claims that Officer White applied the cuffs too tightly, White alleges he did not apply them at all. Moreover, Donohue conceded at his deposition that he did not express that the cuffs were too tight at the time they were applied, but only out of fear of suffering another physical assault. The medical records from June 6, 2013, do not reflect any redness, bruising or swelling of the left wrist, but records from as early as June 10, 2013, do show a diagnosis of neuropraxia for which various medications were administered. Next, as for the threat reasonably perceived by the responsible officials, those circumstances already have been discussed with relation to the physical assault by Officers White and Carroll in Donohue's cell, and they will not be repeated here. The court need only state that the facts alleged would give rise to such a reasonably perceived threat. Lastly, I find that no efforts were made to temper the severity of the alleged forceful response.

For all of the reasons just stated, I find that there are genuine disputes of material fact as to whether Officer White applied the handcuffs to Donohue's left wrist in such a manner as to maliciously and sadistically cause harm or to maintain or restore discipline, thereby precluding the entry of summary judgment in defendant White's favor on this claim, and I recommend that the court, accordingly, deny the same. Given these genuine disputes of material fact, I find that Defendant White also is not entitled to qualified immunity on this claim at this time.

### 3. Shower Assault

Next, Donohue claims that Officers White and Carroll used excessive force against him while he was being decontaminated of the OC pepper spray in the shower on June 6, 2013. Specifically, he claims that both officers slammed his head against the shower wall and kneed him in the ribs several times, stating "This is for making me and all of us go in your cell after you in that dirty stinking toilet water. Plus, this is also for all the grievances you have been filing, and you better back off if you know what is fucking good for you ...." (Complaint at 9.) Officer White has provided sworn testimony that, at no time, did he push Donohue's head under the water, slam his head into the shower wall or knee him in the ribs. (White Affidavit at 2.) He stated that he did not physically assault Donohue in the shower following the cell extraction on June 6, 2013. (White Interrogatories at 5.) Instead, White stated that he was "maintaining" Donohue in the shower while he was being decontaminated. (White Interrogatories at 6.) Likewise, Officer Carroll, in answers to interrogatories, denied physically assaulting Donohue in the shower on June 6, 2013. (Carroll Interrogatories at 2.) In fact, Officer Carroll denied even being in the shower area with Donohue. (Carroll Interrogatories at 2.)

There is handheld video footage of Donohue's decontamination in the shower, but, as with the cell extraction, it does not provide much aid in resolving these factual disputes. The camera is not always pointed in Donohue's direction in the shower, and the audio is difficult to discern. What is clear is that the video does not show anyone physically assaulting Donohue in any way. Again, however, the camera is not always trained in Donohue's direction and, when it is pointed to the shower, Donohue cannot be seen, as various officers are blocking the camera's view of him. A review of the video also does not show Donohue being disruptive or aggressive while in the shower. Donohue contends that he received cuts, bruises and lacerations from this alleged assault in the shower, and the video does reveal that Donohue has an actively bleeding laceration to the right side of his forehead region.

Turning to the objective component of the excessive force claim, I find that Donohue has established a genuine dispute as to whether a nontrivial amount of force was used on him by Officers White and Carroll in the shower. As stated herein, the medical records evidence that Donohue had several lacerations and scrapes, red areas to his face, chest, arms and back and a swollen right eye, and the video reveals at least one bleeding laceration to his head when he is removed from the shower. Taking the evidence in the light most favorable to Donohue, he was kneed in the ribs several times and his head was slammed into the shower wall several times, resulting in injuries. Thus, his medical record reflects injuries that could have been sustained from having his head slammed into the shower wall and being kneed in the ribs. That being the case, I find that a reasonable jury could conclude that a nontrivial amount of force was used upon Donohue by Officers White and Carroll while he was being decontaminated in the shower on June 6, 2013.

As for the subjective component, under Donohue's version of the facts, no force was needed, as he no longer was disruptive after the cell extraction. According to Officer White, Donohue was attempting to spit on staff and was being verbally threatening to staff. (White Interrogatories at 6.) Likewise, the VDOC Incident Report states that Donohue continued to be verbally disruptive and made threats of harm toward staff. (VDOC Incident Report at 2.) Donohue denies these contentions, claiming that he was not disruptive at any time following the cell extraction. However, even assuming there was a need for the application of force, the amount of force used, as alleged by Donohue, could be found disproportionate thereto. Kneeing an inmate in the ribs several times and slamming his head against a shower wall could be found to be excessive and disproportionate to some "aggressive" behavior, which was not specified, and attempts to spit on officers. Furthermore, if Donohue's version of the facts is believed, then the officers would not have reasonably perceived any threat from him. Lastly, assuming the assault occurred, there is no evidence of any efforts to temper the severity of the forceful response.

Based on the evidence before the court, viewed in the light most favorable to Donohue, there are genuine disputes of material fact as to whether Officers White and Carroll used force against him in the shower in a good faith effort to maintain or restore discipline or maliciously and sadistically for the purpose of causing harm. Therefore, I recommend that the court deny the Defendants' Motion on these claims. Given these genuine disputes of material fact, I find that Officers White and Carroll also are not entitled to qualified immunity on these claims at this time.

### 4. Five-Point Restraints

Donohue next argues that certain defendants utilized excessive force in either initially placing him in five-point restraints or strapping him back down in five-point restraints after he had been allowed to get up for restroom breaks. Defendant Major Arvil Gallihar approved Donohue's placement in five-point restraints, and Sgt. Barton, Lt. Lambert and Lt. Blevins actually placed him in the restraints after he was assessed by medical staff. Defendant McCowan strapped him back down at various points throughout the night after he was allowed up for restroom breaks.

The use of four- or five-point restraints in a good faith effort to control prison inmates is not per se unconstitutional. *See Williams*, 77 F.3d at 763; *Sadler v. Young*, 325 F. Supp. 2d 689, 702 (W.D. Va. 2004), *rev'd on other grounds*, 118 F. App'x 762 (4th Cir. 2005). However, lengthy restraint of this magnitude can satisfy the objective component of an excessive force claim. *See Williams*, 77 F.3d at 762, 762 n.2 (noting that because "[m]ankind has devised some tortures that leave no lasting physical evidence of injury," "courts should be wary of finding uses of force that inflict 'merely' pain but not injury" to be outside the scope of Eighth Amendment protection); *Sadler*, 325 F. Supp. 2d at 704 (finding "physical and mental pain" of having all limbs and chest restrained for two days was sufficient to meet objective component). Simply stated, there are limits to how long a prisoner can be constitutionally restrained: "[When] the immediacy of the disturbance [i]s at an end … the unnecessary infliction of continued pain throughout a prolonged time period clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance." *Williams*, 77 F.3d at 765 (citing *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990) ("[P]unitive

intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate nonpunitive governmental objective.") (quotations omitted)). Thus, application and/or continued use of five-point restraints on an inmate who does not currently pose any threat to security or discipline can be violative of the Eighth Amendment even when that inmate does not suffer significant injuries. *See Sadler*, 325 F. Supp. 2d at 704; *Davis v. Lester*, 156 F. Supp. 2d 588, 594 (W.D. Va. 2001).

At the outset, the court notes the defendants' contention that Donohue conceded at his August 31, 2015, deposition that his initial placement in five-point restraints was lawful and remained so for the first few hours. The defendants have provided the court with portions of this deposition transcript in which the following exchange occurred:

> Q: And when do you think your actions signaled to them, I'm done?
>
> A: Basically – I should say after the cell extraction, but I do understand that, like, say, being released from anything has to be – it's supposed to be within, I don't know, what is it, between two to four hours outside of medical health, without – you have to not be disruptive or something like that.
>
> Q: All right. So, assuming you were strapped down in five-point at 5:00, 5:30, you think you were legitimately held until 9:30 or 10:00 or so in five-point?
>
> A: I'd probably say yeah.[7]

---

[7] This portion of the transcript is contained within page 146. The next page of the transcript provided to the court is page 160. Therefore, the court does not have in its possession the remainder of Donohue's answer to this question, if any.

(Donohue August Deposition at 36.) However, Donohue recently has filed a document with the court, disputing that he ever admitted that he was properly placed in five-point restraints for the first four to five hours. (Docket Item No. 372.) Instead, Donohue alleges that he answered "No" when asked if this was the case, and the transcript is inaccurate. That being said, the court will consider this fact still in dispute. Donohue seeks to hold Major Gallihar, who approved the use of the restraints, as well as Sgt. Barton, Lt. Lambert and Lt. Blevins, who were responsible for actually placing him in the restraints, liable for use of excessive force. As already set forth more fully herein, Donohue does not dispute his behavior leading up to the cell extraction. He admits that he disobeyed several direct orders and continued to refuse to voluntarily exit his cell even after being sprayed multiple times with OC pepper spray. He further admits making a statement to the effect of "You are going to have to kill me to get me out of here." All of this is further supported by the video evidence. I find that, given Donohue's admitted disruptive and threatening behavior, his initial placement in five-point restraints constituted a good faith effort to restore discipline. Accordingly, I will recommend that the court enter summary judgment in favor of these defendants on this claim. That being the case, I also find that these defendants are entitled to qualified immunity on this claim, as well.

Next, Donohue claims that Lt. McCowan used excessive force on him when he returned him to five-point restraints after letting him up for restroom breaks after the initial strap-down. Donohue claims that he was let up for the first restroom break, approximately seven hours after being placed in the five-point restraints, at which time he already had urinated on himself. The parties' versions of facts are sharply in dispute as to Donohue's behavior while he was in five-point restraints. Donohue claims that he was not disruptive at all after he was placed in five-point restraints. However, the defendants claim that he continued to display

disruptive and aggressive behavior toward Red Onion staff. As noted herein, the Log Book indicates that when Lt. McCowan let Donohue up for a restroom break at 12:54 a.m. on June 7, 2013, there already were eight separate notations of Donohue behaving in a disruptive and threatening manner, including making threatening statements toward staff. (Log Book at 1-2.) The Log Book also indicates that Lt. McCowan had previously offered Donohue a bathroom break at 7:41 p.m., but Donohue would not respond and was acting aggressively, stating "All you [corrections officers] are going to get it." (Log Book at 1-2.) Interestingly, despite all of these notations of disruptive and threatening behavior, when Donohue was let up for the restroom break at 12:54 a.m., he was placed in ambulatory restraints and then returned to five-point restraints "without incident." (Log Book at 2.) Following this initial restroom break, three more notations were entered into the Log Book of Donohue's disruptive and threatening behavior before Lt. McCowan and others entered to offer Donohue another restroom break at 3:44 a.m. (Log Book at 2-3.) At that time, it was noted that Donohue continued to be aggressive toward staff and had made statements, including, "I'm going to get you [corrections officers] when they let me up out of restraints." (Log Book at 2-3.) Nonetheless, once again, he was let up and returned to five-point restraints "without incident." (Log Book at 3.) Two additional notations were entered into the Log Book regarding Donohue's aggression and anger toward staff before he was offered a restroom and breakfast break at 6:50 a.m. by Lt. Day and Lt. L. Fleming. (Log Book at 3-4.) There is no notation regarding his behavior at that time; however, he was released from five-point restraints at 8:10 a.m., and he was released from ambulatory restraints to return to his cell at 8:23 a.m. (Log Book at 4.)

Donohue alleges that the entries regarding his disruptive and aggressive behavior contained in the Log Book are inaccurate, as he did not display any such

behavior once placed in the restraints. The court notes that, despite any alleged statements made by Donohue while in five-point restraints regarding threats toward staff, he did not act out in any manner when he was let up for restroom breaks. Also, while there is no video of Donohue during these breaks, the video of Donohue while being placed in five-point restraints, as well as that of him being released from five-point restraints, does not show any aggressive or threatening behavior on his part.

Turning to the objective component of Donohue's excessive force claim, the defendants argue that because Donohue conceded in his deposition that he received no physical injury from being held in the five-point restraints, he, necessarily, cannot sustain his claim. I disagree. As stated above, continued use of five-point restraints on an inmate who does not currently pose any threat to security or discipline can be violative of the Eighth Amendment even when that inmate does not suffer significant physical injuries. *See Sadler*, 325 F. Supp. 2d at 704; *Davis*, 156 F. Supp. 2d at 594. Furthermore, Donohue alleges that he was held for seven hours before being allowed a restroom break, at which time he already had urinated on himself. The defendants dispute this contention with the Log Book entry, which shows he was offered a bathroom break approximately two hours after being placed in the restraints, but to which Donohue refused to respond. Donohue, however, claims that the Log Books are inaccurate.

With regard to the subjective component of this excessive force claim, the defendants contend that Donohue remained disruptive and aggressive throughout the night while in five-point restraints, while Donohue claims that, once in five-point restraints, he never exhibited such behavior. Despite the Log Book's multiple entries reflecting aggressive and disruptive behavior by Donohue, including direct threats to harm staff when he was released from the restraints,

Donohue was let up on three occasions "without incident." Comparing these two versions of events, I find that genuine disputes in material fact remain as to whether Lt. McCowan's continued use of five-point restraints was a good faith effort to maintain or restore discipline or was malicious and sadistic for the very purpose of causing harm. Therefore, I recommend that the court deny McCowan's Motion on Donohue's claim that he used excessive force against him by returning him to five-point restraints. Given these genuine disputes of fact, I further find that granting Lt. McCowan qualified immunity on this claim is not appropriate at this time.

### B. Bystander Liability

The remainder of Donohue's claims are premised on the concept of bystander liability. While an officer generally may be held liable under 42 U.S.C. § 1983 only for affirmative conduct, the Fourth Circuit held in *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 203-04 (4th Cir. 2002), that in certain situations, officers may be liable for failing to act. In recognizing the existence of bystander liability, the Fourth Circuit stated that "[a]ny rule to the contrary would permit officers to ignore their duty to enforce the law" *Randall*, 302 F.3d at 204; *see also Willis v. Oakes*, 493 F. Supp. 2d 776, 784 (W.D. Va. 2007). This court has held that, in order for bystander liability to attach, the plaintiff must demonstrate that the bystander officer (1) knew that another officer was violating the plaintiff's constitutional rights; (2) had a reasonable opportunity to prevent the other officer from committing the violation; and (3) chose not to act. *See Willis*, 493 F. Supp. 2d at 784 (citing *Randall*, 302 F.3d at 204). In *Randall*, the Fourth Circuit cited the Second Circuit case of *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988), in which the court found insufficient evidence to support a verdict against an officer for his failure to intervene because the "three blows were struck

in such rapid succession that [the officer] had no realistic opportunity to attempt to prevent them." The *O'Neill* Court observed that "[t]his was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator." 839 F.2d at 11-12.

In determining what constitutes a reasonable or realistic opportunity to prevent another officer from committing a violation of a plaintiff's constitutional rights, courts have found that the duration of the alleged misconduct is an important factor to consider. For instance, in *Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015), the Second Circuit affirmed summary judgment for bystanders' failure to prevent another officer's "fairly immediate" conduct. Likewise, in *Miller v. Gonzalez*, 761 F.3d 822, 826 (7th Cir. 2014), the Seventh Circuit noted that a "realistic opportunity" means "a chance to warn the officer using excessive force to stop." In *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 639-40 (6th Cir. 2013), the Sixth Circuit found that the events at issue "occurred rapidly" and did not involve "ongoing excessive force," and the court affirmed summary judgment for the bystanders. In *Wallin v. Dycus*, 381 F. App'x 819, 823-24 (10th Cir. 2010), because the incident at issue lasted only two minutes, the Tenth Circuit affirmed summary judgment for a bystander. In *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009), the Seventh Circuit affirmed summary judgment in favor of a bystander, given testimony of the brevity of the alleged incident. In *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 506 (6th Cir. 2007), the Sixth Circuit stated that "courts have been unwilling to impose a duty to intervene where, as here, an entire incident unfolds 'in a matter of seconds.'" (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 207 n.3 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991)). In *Thompson v. Boggs*, 33 F.3d 847, 857 (7th Cir. 1994), the Seventh Circuit affirmed summary judgment for a bystander, where "the whole incident happened quickly." In *Gaudreault*, 923 F.2d

-29-

at 207 n.3, the First Circuit affirmed summary judgment where the plaintiff's allegation was that "the attack came quickly and was over in a matter of seconds."

Donohue alleges that Lt. Payne, Officer Brinkley, Lt. Gilbert, Officer Mullins, Sgt. Deel and Officer McCurdy failed to intervene when Officers White and Carroll were assaulting him during the June 6, 2013, cell extraction. However, given the case law cited above, and taking the facts in the light most favorable to Donohue, I find that he has failed to establish the existence of a genuine dispute as to whether any of these defendants had a reasonable opportunity to intervene in this alleged assault. Even assuming that all of these defendants were present at the time this alleged assault occurred and were in a position to see the assault occurring, Donohue conceded that only approximately 15 seconds elapsed from the time the first blow was struck until the time the fourth and final blow was struck. I find that 15 seconds does not constitute a sufficient amount of time to afford any of these defendants a reasonable opportunity to intervene in the alleged assault by Officers White and Carroll during the cell extraction. Thus, I further find that Donohue cannot establish a bystander liability claim against any of these defendants, and I recommend that the court grant summary judgment in their favor. For the same reasons, I further find that these defendants also are entitled to a grant of qualified immunity on these claims.

I now turn to Donohue's bystander liability claims related to the alleged assault in the shower. Donohue seeks to bring such claims against Lt. Gilbert, Lt. Franklin, Officer Mullins, Officer McCurdy, Lt. Payne, Sgt. Deel and Lt. Lambert. As with his claim regarding the assault in his cell, I find that the evidence, viewed in the light most favorable to Donohue, does not support a finding that the officers had a reasonable opportunity to intervene. Again, even assuming that the assault occurred, that all of these officers were present at the shower and that all were

-30-

positioned in such a way as to view the assault, the duration of the assault was brief in nature. In particular, the video evidence establishes that Donohue was decontaminated in the shower for slightly more than one minute. Donohue's decontamination was video recorded by Officer Brinkley, and, as Donohue contends, the camera is not always trained directly at Donohue. When the camera is pointed in Donohue's direction, however, no one can be seen assaulting him because various officers are blocking the camera's view of Donahue. Even assuming that Donohue is being assaulted at all times while in the shower, it would have been for a time period of just slightly more than one minute. Given the case law set forth above, I find that such a time period simply would not constitute a sufficient time to allow the officers a reasonable opportunity to intervene. Therefore, I further find that Donohue has failed to establish a genuine dispute as to this point, and I recommend that the court grant summary judgment in favor of all of these defendants on these claims. For the same reasons, I find that these defendants also are entitled to a grant of qualified immunity on these claims.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Genuine disputes of material fact exist as to whether Officers White and Carroll used excessive force on Donohue by striking his head while restrained during a cell extraction on June 6, 2013;
2. Officers White and Carroll are not entitled to the defense of qualified immunity on this claim at this time;
3. Officers White and Carroll are not entitled to summary judgment on Donohue's excessive force claim related to the physical assault during the June 6, 2013, cell extraction;

4. Genuine disputes of material fact exist as to whether Officer White used excessive force in applying handcuffs to Donohue's left wrist during the June 6, 2013, cell extraction;

5. Officer White is not entitled to the defense of qualified immunity on this claim at this time;

6. Officer White is not entitled to summary judgment on Donohue's excessive force claim related to the June 6, 2013, handcuffing incident;

7. Genuine disputes of material fact exist as to whether Officers White and Carroll used excessive force on Donohue by slamming his head into the shower wall and kneeing him in the ribs during the OC decontamination on June 6, 2013;

8. Officers White and Carroll are not entitled to the defense of qualified immunity at this time on these claims;

9. Officers White and Carroll are not entitled to summary judgment on Donohue's excessive force claims that they assaulted him in the shower on June 6, 2013;

10. There is no genuine dispute that Major Gallihar, Sgt. Barton, Lt. Lambert and Lt. Blevins approved the use of and/or applied five-point restraints to Donohue on June 6, 2013, in a good faith effort to maintain or restore discipline;

11. Major Gallihar, Sgt. Barton, Lt. Lambert and Lt. Blevins are entitled to the defense of qualified immunity on these claims;

12. Major Gallihar, Sgt. Barton, Lt. Lambert and Lt. Blevins are entitled to summary judgment on Donohue's claims that they used excessive force in placing him in five-point restraints on June 6, 2013;

13. Genuine disputes of material fact exist as to whether Lt. McCowan used excessive force on Donohue when he returned him to five-point restraints;

14. Lieutenant McCowan is not entitled to the defense of qualified immunity at this time on this claim;

15. Lieutenant McCowan is not entitled to summary judgment on Donohue's excessive force claim related to his return to five-point restraints;

16. There is no genuine dispute that Lt. Payne, Officer Brinkley, Lt. Gilbert, Officer Mullins, Sgt. Deel and Officer McCurdy did not have a reasonable opportunity to intervene in the alleged assault of Donohue by Officers White and Carroll during the June 6, 2013, cell extraction;

17. Donohue fails to demonstrate that Lt. Payne, Officer Brinkley, Lt. Gilbert, Officer Mullins, Sgt. Deel and Officer McCurdy violated his

constitutional rights, thereby entitling them to the defense of qualified immunity on these claims;

18.    Lieutenant Payne, Officer Brinkley, Lt. Gilbert, Officer Mullins, Sgt. Deel and Officer McCurdy are entitled to summary judgment on Donohue's failure to intervene claims against them;

19.    There is no genuine dispute that Lt. Gilbert, Lt. Franklin, Officer Mullins, Officer McCurdy, Lt. Payne, Sgt. Deel and Lt. Lambert did not have a reasonable opportunity to intervene in the alleged assault of Donohue by Officers White and Carroll during the OC decontamination shower on June 6, 2013;

20.    Donohue fails to demonstrate that Lt. Gilbert, Lt. Franklin, Officer Mullins, Officer McCurdy, Lt. Payne, Sgt. Deel and Lt. Lambert violated his constitutional rights, thereby entitling them to the defense of qualified immunity on these claims; and

21.    Lieutenant Gilbert, Lt. Franklin, Officer Mullins, Officer McCurdy, Lt. Payne, Sgt. Deel and Lt. Lambert are entitled to summary judgment on Donohue's failure to intervene claims against them.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that McCowan's Motion be denied, Payne's Motion be granted, and the Defendants' Motion be granted in part and denied in part.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The

judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: December 10, 2015.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE